Continental Casualty Company *v.* Brittner.

Opinion delivered February 4, 1907.

Accident insurance—death from unnecessary exposure.—Where a policy of accident insurance provided that "in any case where the accidental injury results from unnecessary exposure to danger or obvious risk of injury the sum payable shall be one-tenth of the amount which would otherwise be payable under said policy," it was error not to direct a verdict for the insurance company, where it made a tender of one-tenth of the amount payable under the policy, if the undisputed evidence showed that the death of plaintiff's assured resulted from an unnecessary exposure to danger or from an obvious risk of injury, as where the evidence showed that, while stealing a ride on a dark and rainy night upon a moving freight train, without a lantern, assured fell between two cars and was killed.

Appeal from Pulaski Circuit Court; *Robert J. Lea,* Judge; reversed.

STATEMENT BY THE COURT.

This is an action by appellee, the beneficiary in an accident policy issued by appellant, insuring the life of Herman E. Brittner against death by accident, in the sum of $1,500.

The complaint alleged the issuance of the policy, and that the assured had been run over and accidentally killed by a railroad train. Notice of the death and other facts necessary to state a proper cause of action were properly set forth in the complaint, and judgment was asked for the amount of the policy.

In its answer appellant admits that assured was run over by a railroad train, and that he died from the effects thereof, but denies that he was accidentally run over within the meaning of the policy. Appellant then set up the following: "Defendant states that it is provided in said policy that in any case of death, where the accidental injury results from unnecessary exposure to danger or obvious risk of injury, the sum payable shall be one-tenth of the amount which would otherwise be payable under said policy. Defendant states that said Brittner climbed on top of a freight train of the St. Louis, Iron Mountain & Southern Railway Company for the purpose of riding thereon, that he was not an employee of said company, and had no right to ride on said train and on the top thereof, and that while said train was moving fast in the night time, and while it was dark and raining, the said Brittner was walking on said train without a light or lantern, and suddenly disappeared from the top of said train and under the wheels thereof, where he was mangled and killed." Defendant states that said exposure was an unnecessary exposure to danger and to an obvious risk of injury, and for which there could be due in any event only the sum of $150 under said policy. Defendant states that said Brittner owes the sum of $20.30 on his premium, and that there could not be due the plaintiff more than the sum of $129.70; that said amount has heretofore been tendered to plaintiff and by her refused. Wherefore defendant prays to be discharged with its costs and for all other proper relief.

The facts are as follows: On the night of March 5, 1904, between nine and ten o'clock, just before the extra west-bound freight train pulled out for Ft. Smith from the Ft. Smith cross-

ing, a young man approached the engineer and exhibited a fireman's brotherhood card, asking to be permitted to ride. The brotherhood cards were usually recognized as passes, but they were not always so recognized, and those desiring to use them ascertained beforehand whether they would be accepted. Hence Brittner's inquiry about his card on this occasion. The engineer told him that the card was not good with him, but to see the fireman, who probably belonged to his order, and who had gone to the restaurant. The engineer did not know the young man, and could not describe his appearance. The fireman, who had gone to the restaurant about two blocks south of where the engine was standing in the Iron Mountain yard while waiting to start, on his return to his engine met Herman Brittner, the assured. He says that Brittner spoke to him, stated that he wanted a free ride to Van Buren, and told him that he had just been down to the engine to see him, and that the engineer had referred him to the fireman. The fireman says he knew Brittner well, and described him. He says he told Brittner to go to see the conductor, who was at the depot; that they were about ready to start out for Ft. Smith. He says Brittner walked with him a short distance toward the depot, left him and went over to the depot to see the conductor. While with him, he showed his brotherhood card. The fireman did not know whether Brittner saw the conductor. His train left in a few minutes after he left Brittner. He was keeping a lookout as best he could between firing. He did not feel his engine run over anything, could have felt it very easily had it done so. The conductor testified that Brittner did not find him. The brakeman who was on the train with the engineer who had seen the young man whom the fireman identified as Brittner testified that as they were coming out of a switch right around the "Y" a short distance north of the Ft. Smith crossing, he saw a man on top of the train coming towards him. He could see him while the fireman was opening his box to fire the engine. The reflection from the fire box was like a headlight or electric light, and he plainly saw a man on top of the train approaching him or going in the direction of the caboose. The man was six or eight cars ahead of the brakeman, who was on the fourth of fifth car from the caboose. The brakeman saw the man disappear, and thought he had fallen off. When he saw the

man disappear, he went to the place where he saw him and found no one. Their first stop was at Conway. The brakeman went over the train there and found blood, bones and brains on the brake beam, the brake shoes and on the wheel of about the twelfth car from the caboose. That car was about the place he last saw the man coming out of the crossing. The conductor testified that at Conway they received information which led them to make a close investigation of the cars with the result that they found blood and brains on the wheels of the twelfth car from the caboose, but nowhere else on the train. They also found the pin-lifter that lifts the pin and the coupler torn loose.

There were 31 cars in the train. The train when it passed the "Y" out of the switch at the crossing, was traveling about seven or eight miles an hour, not too fast for a man who had been in the railroad service and accustomed to boarding moving trains to get on. It was in evidence by the undertaker that Brittner's body was found about 150 feet north of the viaduct. The body was lying sort of diagonally between the rails with head mangled and feet pointing toward the north. The head was severed from the body and lying outside of the left, or west, rail, and about eight feet from the body. Several persons had preceded the undertaker to the place, and he did not know whether the body had been disturbed. The undertaker was at the place about twelve at night, and it was raining and dark. He was not very familiar with the locality, and might have been mistaken as to distances. A policeman who was familiar with tracks, having run on the road for five years, and who was at the body about a half hour before the undertaker was there, testified that he found the spot where he first saw the body without difficulty, and measured the distance from where Brittner was killed to the viaduct. It was thirty-six rails of about thirty feet to the rail. The distance from where the switch goes on to the main line, called the "Y," to the viaduct is 31 rails, and from the Ft. Smith crossing to the switch is about ten rails, making 41 rails from the viaduct to the crossing. These distances were measured, and a memorandum taken of them by one who went there for the purpose of getting accurate measurements.

At the time Brittner was killed there were two passenger trains a day to Van Buren, one left about 8:30 o'clock at night,

and one about the same hour in the morning. The passenger train that left at night had gone before the train on which Brittner was seeking passage, and the next passenger train did not leave till next morning, arriving at Van Buren about 3 o'clock in the afternoon. The only way a man could get to Van Buren after ten o'clock at night would be either to take a freight or wait until next morning and go on the passenger. There was testimony showing that the riding on top of freight trains on a dark night, without a lantern, passing from one car to another, was such an exceedingly hazardous undertaking that no sane man, in the opinion of the conductor, would undertake it, not even an experienced railroad man. It was a dark and rainy night, the cars were wet and slippery. The distance between freight cars was nearly two feet on top. To pass from one to the other over this space on a dark night without a lantern when the train was running and the distance varying as the cars moved, was regarded by the conductor as a foolhardy undertaking. The conductor said that a locomotive fireman, as Brittner had been, would understand the danger. He further said that he would not say the man was crazy who would take such desperate chances, because some people naturally take more chances than others, but he would say that he did not know whether a man that would take such desperate chances was crazy or not. Some sane men he had known to do some very foolish things and to take very desperate chances. The width between the rails was four feet eight and one-half inches. The brake rods and other attachments between freight cars, when coupled, obstruct between thirteen and fifteen inches of that space. The brake beams average from six to eight inches clear of the top of the rail. There was proof to the effect that a brakeman was once run over by an engine without being hurt, but the engine was higher than the ordinary engine, and the brakeman regarded his escape as miraculous. Other instances were in evidence showing that an engine one time had passed over a man doing no other damage than cutting off his foot, and, in another case, a brakeman had fallen down under the cars, and was run over by three or four cars without being hurt. But all the witnesses testifying to the subject concurred in the opinion that it would not be probable for an engine to knock a man down and for it and seventeen cars

to pass over him without touching him. It would be improbable for the engine and so many cars to knock a man down and pass over him without killing and mangling him, say some of the witnesses. The appellee read in evidence an affidavit made by Michael Brittner, the father of Herman Brittner, the assured, in making the proofs of death required under the policy. In that affidavit he states "that he had personally investigated the cause of the accident, and had made personal inquiry from all persons whom he could learn could give him any information with reference to the accident, that the last seen of his son, the insured, was by the brakeman, and that they saw him last making his way back over the tops of the freight cars on his way to the caboose;" and that "he believes that said Herman E. Brittner came to his death by falling from the said train of cars and being run over by part of the train."

The court refused the following request: "You are directed that you can not find for the plaintiff in excess of the sum of $129.70." To which ruling the appellant objected and excepted.

The verdict and judgment were for $1,479.70 with interest.

A motion for new trial, reserving the exceptions and containing an assignment that the verdict was contrary to the evidence, was overruled, and this appeal taken.

*Ashley Cockrill,* for appellant.

1. The court erred in instructing the jury, in effect, that proof that the body of deceased was found on the railroad track between the rails, etc., with his head severed from the body, made a *prima facie* case that he came to his death by violent and accidental means, whereas they should have been instructed that such proof alone does not raise a presumption of death by external violent and accidental causes, and further that the burden was on plaintiff to prove the death from such causes by a preponderance of the evidence. 106 Ia. 281 ; 69 S. W. 469. In stock-killing cases no presumption of negligence arises merely from the fact of finding the stock killed or injured near the railroad. It devolves on the plaintiff to prove that the killing or injury was done by the railroad. 80 Ark. 72; 42 Ark. 126; 60 Ark. 189; 56 Ark. 549. Neither does such presumption arise in this case merely because the dead body was found on the track.

2. The jury should have been instructed to return a verdict for the plaintiff for the sum of $129.70, being one-tenth the face of the policy less the premium due.

Where a *prima facie* case is clearly overcome by testimony which is reasonable and consistent, and which is not contradicted by other evidence, a verdict for the plaintiff will be set aside. 67 Ark. 514; 80 Ark. 396; 79 Ark. 608.

*A. N. DeMers* and *Bradshaw, Rhoton & Helm,* for appellant.

1. Having in its answer admitted the accidental death, appellant can not complain because the court stated to the jury what made out a *prima facie* case. 129 Mo. 76; 60 N. Y. Supp. 188. Where a company seeks to excuse itself because of some breach of the provisions of the contract, the burden rests upon the company. 13 L. R. A. 263; 26 *Id.* 406; 61 N. W. 485; 144 Mass. 572; 54 N. W. 453; 50 Am. St. Rep. 427, and notes; 60 *Id.* 154. Where the plaintiff has made out a *prima facie* case of accidental death (admitted in this case), the burden is on the defendant to show death from a cause which excepted it from liability. 174 Mo. 256; 1 Cyc. 290; *Id.* 300. See, also, *Id.* 248; 8 Am. St. Rep. 758.

2. The verdict is sustained by the evidence. 109 Fed. 847; 87 S. W. 812; 58 Pac. 390; 97 N. W. 862; 59 Atl. 262; 80 Ark. 190.

*Ashley Cockrill,* for appellant in reply.

There is no admission in the answer of accidental death, but on the contrary an express denial of it. The effect of the answer is this: Defendant denied accidental death, but alleged that, if the assured died an accidental death, it was by falling from the top of a train, in which event he could recover only a reduced amount. This is legitimate pleading. Bliss on Code Pl. § 344; 35 Ark. 555; 7 Ark. 378.

WOOD, J., (after stating the facts.) The court's fourth instruction was as follows:

"If therefore you believe from the evidence that the assured was killed by falling from the top of a moving freight train upon which he had been riding in a standing position, without light or lantern on a dark and rainy night, and that he was not there

as an employee of the railroad company in the discharge of his duty, you are instructed as a matter of law that assured was guilty of negligence and of unnecessarily exposing himself to danger, and that plaintiff can recover only the sum of $129.70."

Under this instruction the verdict should have been for $129.70. The court erred in not declaring as matter of law that appellee upon the undisputed facts could not recover in excess of $129.70, as requested in appellant's first prayer for instruction. The facts, as established by the uncontroverted evidence, show that Herman E. Brittner was killed by the freight train which left Ft. Smith crossing bound west at about 9:30 o'clock March 5, 1904. Brittner was on the ground about the time for the departure of that train, asking its engineer and fireman for permission to go on that train by exhibiting his brotherhood pass. He was referred by the fireman, who positively identified him, to the conductor of the train, who was supposed to be at the depot. Brittner was last seen alive by the fireman going towards the depot. This was a few minutes before the train pulled out. The direction Brittner took after leaving the fireman was in the course the train would take as it moved out for Ft. Smith. A man was seen by the brakeman, after the train started, on top of the cars, and was seen to disappear therefrom at about the place where Brittner's dead body was found that night. When the train reached Conway, the first stop, the train crew received information which led them to examine the train to see if they had run over some one. Blood and brains were discovered on the brake shoes, brake beams and on the wheels of the twelfth car from the caboose, but nowhere else on the train. There was no blood on the wheels of the engine or any other car of the train. It would have been impossible for Brittner to have reached the place where his body was found, during the interval between the time when he was last seen by the fireman and the time his train reached the place where his body was found, except by going upon the train. He could not therefore have been in front of the engine upon the tracks, or walking beside it, and have been killed and found lying between the tracks as he was. The train was moving slowly enough for Brittner to have climbed upon the top of it as it passed out of the "Y" or left the switch. The twelfth car on which the blood and brains were found occupied the posi-

tion in the train about where the brakeman said he saw the man when he disappeared from the top, and this car was about at the place where Brittner's dead body was afterwards found. Brittner could not have been in front of this train. The time was too short for him to have reached there walking. The engine could not have knocked him down and it and seventeen cars have passed over him without mangling him. That "would have been a miracle," as one of the witnesses expressed it, and the days of miracles have passed. Yet it is reasonably certain that Brittner was killed by this train. Then how was it done? The only explanation compatible with the physical and other facts is that it was done by Brittner's climbing upon the train as it started out from the yards, and by falling from the twelfth car, as indicated by the brakeman, between the cars, and by having his head severed by the wheels of that car. Appellant thus sustained the burden of proving that Brittner was killed in the manner set up in its answer. There was no rebuttal of this. It was not shown that any other train killed him, or could have done so. The place where Brittner's body was found, the manner in which he was killed, the blood and brains on the wheels of the twelfth car, and not on the wheels of the engine and others cars, the fact that he wanted to go on this train, and that a man was seen to disappear from the top of a car about where the twelfth car would have been in the train and about where Brittner's dead body was found as shown by actual measurements—these facts should cause unbiased minds to come to the conclusion that Brittner was killed in the manner indicated, and no other conclusion can reasonably be reached. It is not a question of disputed evidence, the weight of evidence, or the credibility of witnesses. But the question is, the facts being undisputed, what should be the conclusion? There is no room for a difference of opinion, and the court should have declared it as asked in appellant's first prayer, and the jury should have found it under the court's fourth declaration. The judgment is reversed, and the cause is remanded for new trial.